Good morning, your honors. My name is William Weiss, and I represent the appellant in this case. I'm going to reserve two minutes of my time for rebuttal. Fine. In just looking over cases, there's a new case that came out in March of 2003, this Kosalter case, a ninth circuit case. I think it hits some very important points that have been bandied about in earlier arguments. One, it goes to the connection of the alleged protected speech and retaliation and the time factor. In the Kosalter case, we're talking about even 11 months not being too long a gap in time to support an inference that an employment decision was retaliatory. I know that one of the big points in the appellee's brief and in the court below is that, you know, this one, and even the way the brief is constructed, well, this act was seven months later, this act was eight months later, this one was two years later, and this case, Kosalter, makes it clear that that is a factor, the time gap, but not totally. You have to analyze it in view of the other facts. And so they say, they point out in this, I'm not sure how to pronounce this, Allen v. Iranen, which is a 2002 ninth circuit case. Did the district court have the benefit of Kosalter? No, it didn't. As you know, in that discussion of time, it's not a bright line, but the length of time is considered without regard to its factual setting. It's not enough by itself. So, of course, it's a very sensible rule. You look at all the facts. The time is relevant. It is relevant, and it is a factor. And then the – I'm sorry. So what was the, you know, client's speech that really, you say, triggered the – what was he – what actual words was he being retaliated against for? There's two things. The first day that he came in, he was confronted by the defendant, Apelli Gaddini, about why everyone in the district hates him. He had been a principal and Gaddini and his other supervisor disciplined for fraudulent overtime. So that was some past conduct that – Can you say that occasioned retaliation? Yes, that was. The first words out of her mouth, retaliation for that prior act. But there's another set of – That was presumably known already, wasn't it? Right. It was known. That's a good point. They were definitely aware of his speech and what he did, and the first thing that she did was confront him with that, and she performed a case audit on him after he first came under her jurisdiction, and she forwarded up the chain of command. The second area of speech is when he reported to her that the records of supervision were blank and there were dangerous, unsupervised felons that had never been checked on by his predecessor, who had a close personal relationship with the defendant, Apelli Gaddini. All right? A week after he reported that to her, and she – so she was aware of that speech. This court has previously ruled in another appeal that that speech was a matter of public concern. So she retorted to him. He didn't need a book. He was well organized, more than him. She asked him if he had brain damage at another point. He had suffered an injury when he was a correctional sergeant at San Quentin. Then a week after he reported this record of supervision problem, and this is in the record, one of the parolees who was unsupervised got in a gunfight with the San Francisco police. It was in the newspaper. He gave her the article. She wrote an article in her handwriting acknowledging it. And according to the evidence we have in the case, she never forwarded that report up the chain of command. That could have been a serious consequence to her. The rules – and we put in the evidence that when something like that happens with a parolee, it must be forwarded up the chain of command with a report. It never was. Yeah, but that's not an action against him. Well, that's the speech. And then after that is when things, you know, just kept happening over a period of years. And, you know, even though, like I say, this Casaltra case points out that, you know, you only have so many – or, you know, talks about the time gap. In this Allen v. Iranen case – forgive me if I don't pronounce that right – they point out that the longer gap between Allen's statement and later employment actions does not affect the analysis of whether those actions were retaliatory because the court found that all the adverse employment actions were sufficiently similar and related that they constituted a continuing violation. So we say that they started, you know, and then they kept going on. She just couldn't get rid of them, so she kept trying things. And, you know, one thing I think is important is we've really got to focus not just on stuff that Bonomi did or didn't do as an employee, but what about Gaddini? What was she doing? For example, the Whipple incident where he was disciplined for supposedly withholding tools from a parolee to work with. Well, Ms. Gaddini testified under oath that she had nothing to do with that investigation. Denies it completely. We have a document in the record from the main supervisor of that district assigning her to investigate Bonomi. She was a principal investigator of Bonomi in that Whipple incident. And whatever disciplinary laws happened from that, and yet she denied it. The Woolard incident, she pulls a guy off an arrest detail. This guy is a belligerent, agitated person who was on crack at the time and said, oh, I didn't know. And her excuse is, well, gee, I pulled him off the arrest detail, but Bonomi wasn't attacked until they got to the Hall of Justice, and Bonomi went to the hospital on that. Well, the whole point of pulling a guy off is they needed more people all the way from the arrest at the parole office to the Hall of Justice where Bonomi was attacked in the sally port. They were one person short. She pulled him off of that. That's weak. So there's all kinds of things. She tells Bonomi's direct supervisor to write up some sort of criticism of him. She corrects it. And then instead of leaving it in the supervisor's file where it's supposed to be according to the regulations, she forwards it up the chain of command. Doesn't Raya say that's the way she did it a number of times? She was a kind of active person. Raya says that she did stuff that violated the chain of command on other occasions. But on this occasion, we have her doing it in the context of retaliation for protective speech. Well, I mean, that's your theory. That is our theory. That's true. And maybe a jury will believe it, maybe they won't. I don't know. But that's the whole point. Let a jury decide if her explanations are pretextual or Bonomi just doesn't know what he's talking about and he's a poor employee. And the other thing is the defendants or the appellees say, well, gee, you can't show lots of government benefits. Well, from the cases I'm reading, we don't have to show that. We just have to show that her motive was to chill protected speech, and that's enough. It's inconsequential whether he actually suffered ultimate punishment or not. In the concurring opinion in Cozalter, Circuit Judge Ferguson says, he cites Rutan v. Republican Party, Illinois. The Supreme Court stated the First Amendment protects state employees not only from patronage dismissals but also from even an act of retaliation as trivial as failing to hold a birthday party for a public employee when intended to punish her for exercising her free speech rights. So we say that this, you know, panoply of events that occurred over a period of years were continuing. And quite frankly, about 6 o'clock this morning, I thought, you know, every time Bonomi contradicted her or brought up some problem, that might even be considered another protected act of speech. It goes to the operation of the Bureau. So I'm going to save the rest of my time for rebuttal. Thank you. All right. That's fine. Thank you. Good morning. I'm Bill McMahon here on behalf of Appellee Marsha Gaddini. This case has somewhat convoluted facts and even a convoluted litigation history, but we ask you to affirm summary judgment because legally it's straightforward. There has been shown no causation, that is, the supposed retaliatory acts have not been shown to have been caused by this single incident of protected speech. And by the way, there is only one incident of speech which is at issue here, and that is Mr. Bonomi's alleged comment to Gaddini that his caseload was in disrepair because of the actions of the prior predecessor agent. This idea that there is also some other prior incident of reporting his supervisor for misconduct, this is not an issue right now. Mr. Bonomi abandoned this claim early on in this litigation, which is now five and a half years ago. He didn't raise it in his opposition to this present summary judgment, and he's waived long ago this claim that he was being retaliated against for conduct that occurred back in 1990 and 1991, this reporting of another supervisor. So that brings us back to his single claim of protected speech. The law of this case says that it was a matter of public concern, but Mr. Bonomi has completely skirted this issue of causation. Not only was Ms. Gaddini not involved in most of these so-called acts of retaliation, even if you were to, if one were to. Before you make a, and the district court didn't mention this, but the supervisor, Raya, who wrote a negative letter of review, said in his testimony's declaration that she had directed him to do that, and she had directed him to do other things vis-à-vis Bonomi that were not standard practice and procedure. Doesn't that create a tribal issue of fact? Well, I would say no, because Mr. Raya in his declaration also says that Ms. Gaddini behaved this way with respect to all of her underlings. If you want to call it being meddlesome, he claims she was meddlesome on behalf of everybody. So here we have an instance where Mr. Bonomi has not shown that he was treated any differently from anybody else that was his equal. So I don't think there is a tribal issue of fact. Did he have to show that? I thought he had to show that. I don't think that's part of this. This isn't a Title VII claim. No, it's not a Title VII claim. The standard is that the actions that were taken deterred him and that the retaliation was a substantial and motivating factor by the supervisor. And the standard also includes the three-prong analysis that's set forth with respect to causation, with time being one element. And that performance review was two and a half years after his so-called protected speech. Now, time is not dispositive to the extent it was before co-zalter was handed down, but it is an important element in this case because this is not co-zalter. This is not a case where we have 30-something adverse employment actions, which really appear to have been adverse. Mr. Co-zalter not only had his pay reduced, but he was terminated. He suffered the ultimate adverse employment action. Mr. Bonomi is still there? Mr. Bonomi is still there. Ms. Gaddini is retired. Has he been promoted at all? I don't know, Your Honor. So we have an instance where even if she was involved in, with Mr. Raya in some, you know, performance or directing him to conduct performance reviews, she herself was not the one passing judgment on Mr. Bonomi's performance. And, you know, if you look beyond whether or not, you know, his feelings were hurt by being told his performance was lackluster, you have to also keep in mind that the record shows he admitted that all the things stated, all the deficiencies stated in that performance review were true. He admitted he wasn't conducting caseload reviews in a timely fashion. Is the fact that he complained that Agent Lovario had not kept adequate records, is that undisputed in this case? It is. I mean, of course we have to accept it as being true for the purposes of summary judgment. But is it undisputed? Oh, undisputed? Right. Well, Ms. Gaddini states that that conversation didn't take place, that he didn't come to her and complain about the state of the caseload. But, again, even accepting it as being true, which we must for the purposes of summary judgment, you know, if you look at other instances when an employer opposed an employee's speech, this is not that type of case which would lead you to believe that Ms. Gaddini did oppose a speech. She did not. If she did make the retort that he was so organized, he didn't need to. She wasn't opposing his right to speak out. She merely made a comment in which she opposed ‑‑ I'm sorry, in which she disagreed with what was said. So we have an instance where she wasn't involved in many of these so-called incidents of retaliation. Well, there's two that occurred after the protected speech. The August 6th, which Araya says was directed by her. And then what was the one two and a half years later? The one two and a half years later, well, we have a performance report that's 29 months later. That's October 16th of 1997. And, again, the record shows that Gaddini concurred in the findings of that report. It doesn't show that she had a hand in what the contents of the report were. So we have a very long span of time. And, again, looking beyond the extent to which she might have concurred or not, there were legitimate business reasons for issuing that report. We have Bonomi's own admission that he ‑‑ his performance was substandard, that all the things in the report were true. Now, perhaps you're thinking of a letter of counseling that Mr. Araya issued to Mr. Bonomi. The two acts that I see as potentially retaliatory are the August 6th, 1996 letter of counseling and Araya's testimony that says that she directed it and then inappropriately passed it up the change of command. And then the second one is the performance report that you're talking about. And there Araya says Gaddini took his draft and made substantial changes. Okay. Both these questions go to whether Araya's testimony in this regard creates a tribal issue of fact. Well, again, I think you still have to finish the analysis. And in the case of the first one you mentioned, the August 6th, 1996 letter of counseling, first off, still we have to consider it's 15 months after his so‑called protected speech. Next we look at the fact, which is in the record, that Mr. Bonomi admitted that all the things that were mentioned in that report were true, that he was filing late board reports, that he had an obligation to submit them in a timely manner and that he was not, and of course he blames it on something else, on migraine headaches. Now, whether or not it was ‑‑ it's not a question before us was it improper for Ms. Gaddini to pass those up the chain of command, but consider this. First we have on the one hand Mr. Bonomi stating that his speech is a matter of great concern, and of course another Ninth Circuit panel, well, two of the three judges here, determined it was a matter of public concern, because it has to do with public safety. And Mr. Bonomi would like to sort of wave that around, but at the same time he disagrees with the decision to bring to the supervisor's attention the fact that he is not performing up to the standard that's required of him. So he would like to escape that requirement, but at the same time hide behind it, and I think that that's worth noting. So we have legitimate business reasons for that 15‑month later performance report, and the same is true of the 29‑month later performance review. He admits that his performance was substandard, and there were legitimate reasons for issuing the letter of counseling in the performance report. Okay. All right. Thank you. Rebuttal. I think I had a minute, 47. Anyway, insofar as this thing about whether Bonomi actually deserved some of the discipline or not, we have to look at the factor. Whether it was Ms. Gaddini, the motivating factor, she was the one that kept dredging these things up. Whether he admitted he wasn't up to par in something or other, she kept after him. Well, if he deserves it, is that showing his free speech? Yes. I mean, once you make a statement of public concern, you then get immunity in your inefficient performance? No, you don't. But in Gilbert it points out that even if the Gilbert case, even if you did deserve the ultimate punishment, if the motivating factor is the ill will and retaliation, then that's actionable. So the question of what he's talking about is whether Bonomi's going to deserve damages for that or not. I thought my general sense is that the mental health standard was the standard, that if it would have been done anyway, then it's not actionable. You have an inefficient employee and you call the inefficiencies to public attention. I would think if that was your motive, it would not be actionable. Well, according to Gilbert, even if the ultimate punishment is deserved, if the ill will and motivating factor is the cause, then it is actionable. And in Cozalter they point out that it's kind of like a lying in wait thing. The defendant may wait until the victim is especially vulnerable, until an especially hurtful action becomes possible, or they may wait until they think the lapse of time disguises their true motivation. And I think that's a... There's a lot of nice speculations in that. Well, I mean, I think that's something for a jury to decide. It's not speculation. We have the protected speech. We have a lot of bad things that happen afterwards, comments that you make. Well, there are lots of bad things, but he did a poor job, and it's uncontested. Well, I don't think it is all uncontested. For example, Mr. Riott comes in one morning early like he usually does. Mr. Scodini is coming out of his office with Bonomi's supervisory file. He said, oh, she's sheepish. What's the jury going to make out of that? Huh? What's the jury going to make out of that? I think that she's sneaking around trying to get dirt on him, takes stuff out of a supervisory file that never goes up the chain of command and using it against him. That's exactly what she did. So, you know, again, I mean, if we're arguing the fine point of whether he deserved punishment, and I think we're straying from the analysis of whether it was motivated by ill will. I mean, whether he deserved it or not or admitted something later is one thing, and a jury could decide whether that's going to weigh one way or another. But, I mean, you've got to look at what she's doing afterwards, why all these things are happening to him consistently over a period of years. And in answer to the court's question to counsel, he's never been promoted. So we think that his speech and the things she did are – and, again, look at her conduct. Damien's gone, but he still can't get promoted. Right. It's her legacy. But the other thing is, even if she doesn't have the final say-so in some of the discipline he may have received, she was the one that got the ball rolling, you know. And whether she intervened in other people's personnel actions or whatever is irrelevant. Look what she was doing to Bonomi. Why would she lie about the Whipple incident if she's so clean, you know? I didn't have anything to do with that, nothing absolutely. Well, here's a document that says you were the chief investigator of it. There's no explanation for that. There's something wrong with that. Daryl Roby, you know, she criticized him for letting some guy go on parole. And then when Bonomi, she wants to call him in her office, he asked for a union representative. She tries to get the union representative in trouble. Why would she do that if she's not doing anything wrong? You've got to look at some of those questions about her conduct, too. It's not just Bonomi. A jury's got to get to weigh what you say about him and his ability to do good work or not. And her half-truths or lies and motivations, on the other hand, that's what we're seeing. I mean, I don't know if we're going to win or not. But I just think we should have a shot at the jury on this because, you know, Kozolter really – All right, all right. We understand your position. I think we're covering all ground, right? All right. I was just rebutting what he said. That's it. You're way over – two and a half minutes. Three minutes over your time. All right? Thank you very much. This case is submitted for decision. All right.
judges: Noonan, Tashima, Wardlaw